## PAINE LUMBER COMPANY, LIMITED, ET AL. *v.* NEAL, INDIVIDUALLY AND AS SECRETARY AND TREASURER OF THE JOINT, DISTRICT COUNCIL OF NEW YORK AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA AND AMALGAMATED SOCIETY OF CARPENTERS AND JOINERS OF AMERICA, ET AL.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 24. Argued May 3, 4, 1915; restored to docket for reargument June 12, 1916; reargued October 24, 25, 1916.—Decided June 11, 1917.

A private party cannot maintain a suit for an injunction under § 4 of the Sherman Anti-Trust Law.

Such action upon the part of a labor union as is involved in this case is not subject to be enjoined under the laws of New York in a private suit.

214 Fed. Rep. 82, affirmed.

THE case is stated in the opinion.

*Mr. Walter Gordon Merritt* and *Mr. Daniel Davenport* for appellants:

The combination falls within that class of restraints of trade intended to coerce third parties and strangers from engaging in interstate trade except on conditions that the combination imposes, and therefore violates the Federal Anti-Trust Law.

The object is to control conditions of manufacture by preventing the sale and use of manufactured articles unless they come from mills operated and exclusively manned by members of the combination. It is a combination between the sources of production and those who control distribution and consumption, to limit the market to producers joining such combination. According to the defendants' contention, they must protect the union mills from the competition of non-union mills because, under the natural law of trade and competition, the union mills cannot survive with their increased cost of production. The rule against using or working on open shop "trim" was therefore adopted to destroy open shop competition. The Master Carpenters' Association also take active steps to enforce this régime in order to protect themselves from the competition of independent contractors using such material.

The conceded purpose is to increase profits and wages in the union mill and to do this by the only possible method by which men working on buildings could accomplish such a purpose, viz: restraining trade or commerce by making open shop products unsalable. There is no relation between the buildings and the factories except commerce, so that the only way in which the conditions in the mills can be affected by the conduct of the men at the buildings is by controlling commerce.

The union manufacturers and their employees have an undoubted interest in extending the sale and use of any merchandise which is produced by their joint efforts,

and may, therefore, justify and excuse any injury which they inflict upon their competitors by the ordinary methods of legitimate competition. They cannot, however, by association or combination with journeymen who have no such interest, but exercise a despotic control over the use and installation of such products, destroy the competition of business rivals and monopolize the market. This is no ordinary labor case, but an instance where the defendants are seeking to project their influence into trade and commerce for the purpose of preventing the sale and distribution of completed articles of common use produced by their competitors. It is an attempt to drive open shop products out of commerce.

The distinction between a combination where parties subject themselves to a self-imposed restraint, and a combination which has also the objective purpose of interfering with outsiders, has been recognized by this court, which holds that the latter combination implies a wrongful purpose. *United States* v. *Patten,* 226 U. S. 525; *Loewe* v. *Lawlor,* 208 U. S. 274; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Standard Oil Co.* v. *United States,* 221 U. S. 1; *Thomsen* v. *Union Castle Mail S. S. Co.,* 166 Fed. Rep. 251; *State* v. *Duluth Board of Trade* (Minn.), 121 N. W. Rep. 395; *Brown & Allen* v. *Jacobs Pharmacy* (Ga.), 41 S. E. Rep. 553.

If the object of the combination be the illegal one described, it is immaterial that the means are otherwise innocent and lawful. There is nothing talismanic about the right to strike which excepts it from this universal and wholesome rule of law. *Aikens* v. *Wisconsin,* 195 U. S. 204; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Swift & Co.* v. *United States,* 196 U. S. 375; *United States* v. *Reading Co.,* 226 U. S. 324; *Loewe* v. *Lawlor,* *supra.*

This doctrine that an act otherwise legal may become illegal when exercised in furtherance of an illegal con-

spiracy has been frequently applied in the case of strikes. [Citing numerous authorities.]

If the means employed are calculated and intended to restrain interstate trade, it is immaterial that they are to be performed or operate entirely within the limits of one State. *Loewe* v. *Lawlor, supra; United States* v. *Reading Co., supra; Swift & Co.* v. *United States,* 196 U. S. 375; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *United States* v. *Terminal R. R. Assn.,* 227 U. S. 683.

The case at bar is undistinguishable in principle from the cases of *Montague* v. *Lowry,* 193 U. S. 38; *Loewe* v. *Lawlor, supra; Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, and *Lawlor* v. *Loewe,* 235 U. S. 522. The judges in the lower court entertained no doubt as to the applicability of the Anti-Trust Law. *Irving* v. *Neal,* 209 Fed. Rep. 471; *Paine* v. *Neal,* 212 Fed. Rep. 259 (case at bar).

The complainants, being irreparably injured in their property rights by acts in violation of the Anti-Trust Law, are entitled to an injunction. The jurisdiction of the District Court was invoked both on account of diversity of citizenship and the Anti-Trust Law. The complainants appealed to its general equitable powers to protect them from irreparable injury to their property rights by unlawful and criminal acts. To deny the power and duty of the chancellor to protect property rights from irreparable injury due to criminal acts, involves an overthrow of fundamental principles and unfortunate consequences which would be far-reaching. If the Federal Anti-Trust Law supersedes all other law relative to combinations which restrain interstate trade and is to be construed as denying the right of an injunction to a private party, then persons irreparably injured in their property rights by such criminal acts, which were exclusively in restraint of interstate trade, would be deprived of their property without due process of law. The federal statute is only

declaratory of the common law without adding to or subtracting from the substantive offense; it specifies the remedies of treble damages, confiscation, and injunction by the government, which were not available under the common law, and, by making restraints which were purely subjective in their nature affirmatively unlawful, entitles a private party suffering damage therefrom to all available civil remedies. Since the law does not lay down any new rule as to combinations which are legal or illegal, the remedies which it prescribes are cumulative and do not exclude common-law remedies.

The law should be construed with a view to suppressing the mischief and advancing the remedy for which it is obviously designed, and to carry with it all the incidents and available remedies which usually accompany such statutes. Upon this question, however, the lower courts are in disagreement.

The cases holding that parties injured by acts in violation of this law are entitled to an injunction under general equitable principles are as follows: *Bigelow* v. *Calumet & Hecla Mining Co.,* 155 Fed. Rep. 877; affd. 167 Fed. Rep. 721; *United States* v. *Addyston Pipe & Steel Co.,* 85 Fed. Rep. 279; *Mannington* v. *Hocking Valley Ry. Co.,* 183 Fed. Rep. 140; *De Koven* v. *Lake Shore & Michigan Southern Ry. Co.,* 216 Fed. Rep. 955; *Hitchman Coal & Coke Co.* v. *Mitchell,* 202 Fed. Rep. 512; *Walsh* v. *Association of Plumbers* (Mo.), 71 S. W. Rep. 455. [Counsel then cited contrary decisions of the lower federal courts, a number of which are mentioned in the dissenting opinion.]

It is our contention that under general principles any person specially injured in his property rights by criminal or unlawful acts is entitled to the usual and appropriate civil remedies to protect him therefrom, and that there is nothing in the Sherman Act which deprives him of that right or contracts the power of the District Court to grant

him injunctive relief. *Hayes* v. *Michigan Central R. R. Co.*, 111 U. S. 228; *Willy* v. *Mulledy*, 78 N. Y. 314; *Mairs* v. *Baltimore & Ohio R. R. Co.*, 175 N. Y. 413; *Huda* v. *American Glucose Co.*, 154 N. Y. 481; *Angle* v. *Chicago & St. Paul Co.*, 151 U. S. 2; *Bitterman* v. *Louisville & Nashville R. R. Co.*, 207 U. S. 206; 1 Rev. Swift's Dig., side page 553; *In re Debs*, 158 U. S. 593, 594; *Cooper* v. *Whittingham*, 15 Ch. Div. 501; *Parker* v. *Barnard*, 135 Massachusetts, 120; *Hayes* v. *Porter*, 22 Maine, 371; *Toledo A. A. & N. M. Ry. Co.* v. *Penn Co.*, 54 Fed. Rep. 730; *Hardie-Tynes Mfg. Co.* v. *Cruse* (Ala.), 66 So. Rep. 657; *Thomas* v. *N. O. & T. P. Ry. Co.*, 62 Fed. Rep. 821.

The fact that Congress has since given a private individual the right to an injunction, by the Clayton Act, seems to indicate what was its intention under the original act.

The complainants have suffered special damages entitling them to injunctive relief.

The defendants' combination violates §§ 340 and 341 of Article 22 of the General Business Law of New York, and complainants, being irreparably injured in their property rights by such unlawful acts, are entitled to an injunction.

If the acts of the defendants constitute a misdemeanor under the terms of this state statute, then the plaintiffs are entitled to all the appropriate and usual civil remedies, even though those remedies are not prescribed by the statute. It is the settled law of New York that one who is specially injured by an act forbidden by the criminal law is entitled to civil relief. *Kellogg* v. *Sowerby*, 190 N. Y. 370; *Rourke* v. *Elk Drug Co.*, 77 N. Y. Supp. 374; *Dueber Co.* v. *Howard Co.*, 24 N. Y. Supp. 647; *Straus* v. *American Publishers' Assn.*, 177 N. Y. 473; 193 N. Y. 496; 199 N. Y. 548; 231 U. S. 222; 85 App. Div. 446; *Park & Sons* v. *National Druggists' Assn.*, 175 N. Y. 1; *Locker* v. *American Tobacco Co.*, 195 N. Y. 565. The statute is little more

than a codification of the common law. *Matter of Davies,* 168 N. Y. 89; *People* v. *American Ice Co.,* 120 N. Y. Supp. 443. The commodities produced by plaintiffs are included. The motive which actuates the members of the combination is immaterial, but the purpose and object of the combination is material. *Kellogg* v. *Sowerby,* 190 N. Y. 370; *People* v. *American Ice Co.,* 120 N. Y. Supp. 443; *Schwarcz* v. *International Union,* 124 N. Y. Supp. 968; *State* v. *Minneapolis Milk Co.* (Minn.), 144 N. W. Rep. 417. If the plaintiffs are to prevail under this statute, it is because the acts of the defendants constitute a public offense forbidden by the statute and have resulted in injury to the plaintiffs. The character of the participants is immaterial. The fact that the defendants are endeavoring to suppress competition in the supply and price of completed articles in common use removes their combination and conduct from the case of *National Protective Assn.* v. *Cumming,* 170 N. Y. 315, and brings them within the purview of the Anti-Trust Law. *Rourke* v. *Elk Drug Co.,* 77 N. Y. Supp. 375; *Loewe* v. *Lawlor,* 208 U. S. 274.

If the combination of the defendants is illegal, then every act in furtherance thereof, though otherwise innocent and constitutionally protected, becomes illegal because done in furtherance of the illegal purpose. Acts which might be innocent when done by one person may become illegal when done by a number in combination in violation of the statute. *Rourke* v. *Elk Drug Co.,* 77 N. Y. Supp. 375; *Locker* v. *American Tobacco Co.,* 195 N. Y. 565; *Locker* v. *American Tobacco Co.,* 106 N. Y. Supp. 118 (Judge Gaynor's opinion); *Walsh* v. *Dwight,* 58 N. Y. Supp. 91.

Generally as to the application of this law to cases like the present, see *People* v. *McFarlin,* 89 N. Y. Supp. 527; *Irving* v. *Neal,* 209 Fed. Rep. 471; *Paine* v. *Neal,* 212 Fed. Rep. 259; *Gill Engraving Co.* v. *Doerr,* 214 Fed. Rep. 111. Within the meaning of this act defendants' combination

(a) seeks to create and maintain a monopoly in the manufacture, production and sale of the articles in question. Their own reports show that they have already acquired a complete monopoly at higher prices of trade in wood trim on the Island of Manhattan, thereby terminating all trade in that borough with any open shops, *People* v. *American Ice Co.*, 120 N. Y. Supp. 443. (b) It attempts to restrain or prevent competition in the supply and price of these articles. (c) It seeks to restrain or prevent the free pursuit of a lawful trade or business, in order thereby to create or maintain a monopoly in the production and sale of these articles. *Straus* v. *American Publishers' Assn., supra; People* v. *McFarlin,* 89 N. Y. Supp. 527; *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401; *Arnot* v. *Pittston Coal Co.*, 68 N. Y. 558.

The restraint is not incidental to any legitimate end which the defendants seek, but is the direct purpose of the combination. The benefits sought by the defendants are the result of the restraint of trade, and the restraint of trade is not the result of the benefits or incidental to them.

The defendants' combination violates subdivision 6 of § 580 of Article 54 of the Penal Law of New York; also subdivision 5 of § 580 of that law; also § 530 of Article 48 of that law.

Section 582 of the Penal Law of New York is declaratory of the common law and does not legalize the defendants' acts.

A combination of traders, to promote their own interests by suppressing the competition of rivals, is illegal at common law and it is immaterial whether the combination aims at one rival or a class of rivals. If the complainants are being irreparably injured in their property rights by unlawful acts committed within the State, they would be entitled to relief regardless of the existing federal law, whether those acts were unlawful at common law or because of some state statute.

The facts establish a combination to cause strikes against customers of complainants for the purpose of preventing the sale of their products as long as they operate an open shop, and is, in effect, a secondary boycott of the complainants, which is unlawful. [Citing many authorities].

The combination of defendants to bring about the employment of members of their organization exclusively in their industry throughout an entire community is unlawful. [Counsel here went into an analysis of the means employed and the rights affected and dangers involved, referring to numerous authorities.]

The relief prayed for will not interfere with the legal provisions of any of the arbitration agreements.

Complainants are entitled to an injunction under § 16 of the Clayton Act, of October 15, 1914. This section is declaratory of ancient common-law principles and is highly remedial, and should be construed so as to advance the remedy. It was meant to remove doubt arising from divergent federal decisions, and is to be taken as a legislative construction of the prior law, of retrospective operation, applicable to pending suits like this. *Bailey* v. *Clark*, 21 Wall. 284; *Tiger* v. *Western Investment Co.*, 221 U. S. 286; *Missouri Pacific Ry. Co.* v. *United States*, 189 U. S. 274; *Dinsmore* v. *Southern Express Co.*, 183 U. S. 115; *Sampeyreac* v. *United States*, 7 Pet. 222; *United States* v. *The Schooner Peggy*, 1 Cranch, 105.

It was not the intention by § 6 of the Clayton Act to change in any respect the Sherman Anti-Trust Act as it had been construed and applied by this court in any case. The history of the legislation, shown by the committee reports and even the debates in Congress, establishes this. Moreover, the act in § 4 re-enacts, word for word, § 7 of the Sherman Anti-Trust Act, under which the *Loewe Case* was brought to and decided by this court, without excepting that or any other case from its provisions,

which action, upon established principles of construction, is an adoption by Congress of the doctrines of that case.

The presence of § 6 in the act is due to the fact that it was thought desirable to put at rest the contentions. of some, that the existence of labor unions for legitimate purposes was forbidden by the Sherman Anti-Trust Act.

Section 20 of the Clayton Act has obviously no application since here the relation of employer and employee does not exist actually or prospectively between the contending parties.

It is further obvious that the various acts mentioned in § 20, against which injunctions shall not issue in this limited class of cases, are most of them acts which in and of themselves are ordinarily lawful, and that this section accomplishes no other purpose than to declare the previously existing law on this subject. The recognition of a right by a statute, such as the Clayton Act, will not justify the exercise of that right in furtherance of a criminal conspiracy, which is expressly defined by the same statute. *Aikens* v. *Wisconsin,* 195 U. S. 194; *Gompers* v. *Bucks Stove. & Range Co.,* 221 U. S. 439.

Otherwise construed, the Clayton law would be unconstitutional as class legislation, and depriving persons of property without due process of law. *Cleland* v. *Anderson,* 66 Nebraska, 252; *Connolly* v. *Union Pipe Co.,* 184 U. S. 540.

It is proper for the complainants to unite as co-plaintiffs since they were all similarly affected by the same combination.

*Mr. Charles Maitland Beattie* for the labor union appellees.

*Mr. Frederick Hulse* for appellees.

*Mr. Anthony Gref, Mr. Charles J. Hardy* and *Mr. Fred-*

*erick P. Whitaker* filed a brief in behalf of appellee James Elgar, Inc.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill in equity brought by corporations, of States other than New York, engaged in the manufacture of doors, sash, etc., in open shops, against officers and agents of the United Brotherhood of Carpenters and Joiners of America and of the New York branch of the same, certain union manufacturers of doors, sash, etc., members of the Manufacturing Wood Workers' Association, and many master carpenters, members of the Master Carpenters' Association, whose business is to install such products in buildings. The bill was dismissed by the District Court, 212 Fed. Rep. 259, and the decree was affirmed by the Circuit Court of Appeals. 214 Fed. Rep. 82; 130 C. C. A. 522.

The bill alleges a conspiracy of the members of the Brotherhood and the New York branch to prevent the exercise of the trade of carpenters by any one not a member of the Brotherhood, and to prevent the plaintiffs and all other employers of carpenters not such members from engaging in interstate commerce and selling their goods outside of the State where the goods are manufactured, and it sets out the usual devices of labor unions as exercised to that end. In 1909 the Master Carpenters, coerced by the practical necessities of the case, made an agreement with the New York branch, accepting a previously established joint arbitration plan to avoid strikes and lockouts. This agreement provides that "there shall be no restriction against the use of any manufactured material except non-union or prison made"; the arbitration plan is confined to shops that use union labor and the employers agree to employ union labor only. The unions will not erect material made by non-union mechanics.

Another agreement between the Manufacturing Wood Workers' Association, the Brotherhood and the New York branch also adopts the plan of arbitration; the labor unions agree that "none of their members will erect or install non-union or prison made material," and the Wood Workers undertake that members of the Brotherhood shall "be employed exclusively in the mills of the Manufacturing Wood Workers' Association." It is found that most of the journeymen carpenters in Manhattan and part of Brooklyn belong to the Brotherhood, and that owing to their refusal to work with non-union men and to employers finding it wise to employ union men, it is very generally impracticable to erect carpenter work in those places except by union labor. It also is found that owing to the above provisions as to non-union material the sale of the plaintiffs' goods in those places has been made less. The workmen have adopted the policy complained of without malice toward the plaintiffs, as part of a plan to bring about "a nation-wide unionization in their trade."

An injunction is asked against the defendants' (other than the Master Carpenters) conspiring to refuse to work upon material made by the plaintiffs, because not made by union labor; or enforcing by-laws intended to prevent working with or upon what is called unfair material; or inducing persons to refuse to work for persons purchasing such material, or taking other enumerated steps to the same general end; or conspiring to restrain the plaintiffs' interstate business in order to compel them to refuse to employ carpenters not members of the Brotherhood. It is prayed further that the provision quoted above from the Master Carpenters' agreement and another ancillary one be declared void and the parties enjoined from carrying them out. No other or alternative relief is prayed. The ground on which the injunction was refused by the District Court was that, although it appeared that the agreements above mentioned were parts of a comprehen-

sive plan to restrain commerce among the States, the conspiracy was not directed specially against the plaintiffs and had caused them no special damage, different from that inflicted on the public at large. The Circuit Court of Appeals, reserving its opinion as to whether any agreement or combination contrary to law was made out, agreed with the judge below on the ground that no acts directed against the plaintiffs personally were shown.

In the opinion of a majority of the court if the facts show any violation of the Act of July 2, 1890, c. 647, 26 Stat. 209, a private person cannot maintain a suit for an injunction under § 4 of the same, *Minnesota* v. *Northern Securities Co.*, 194 U. S. 48, 70, 71, and especially such an injunction as is sought; even if we should go behind what seems to have been the view of both courts below, that no special damage was shown, and reverse their conclusion of fact. No one would maintain that the injunction should be granted to parties not showing special injury to themselves. Personally, I lay those questions on one side because, while the Act of October 15, 1914, c. 323, § 16, 38 Stat. 730, 737, establishes the right of private parties to an injunction in proper cases, in my opinion it also establishes a policy inconsistent with the granting of one here. I do not go into the reasoning that satisfies me, because upon this point I am in a minority.

As this court is not the final authority concerning the laws of New York we say but a word about them. We shall not believe that the ordinary action of a labor union can be made the ground of an injunction under those laws until we are so instructed by the New York Court of Appeals. *National Protective Association of Steam Fitters & Helpers* v. *Cumming*, 170 N. Y. 315. Certainly the conduct complained of has no tendency to produce a monopoly of manufacture or building, since the more successful it is the more competitors are introduced into the trade. Cases like *Kellogg* v. *Sowerby*, 190 N. Y. 370,

concerning conspiracies between railroads and elevator companies to prevent competition, seem to us very clearly not to have been intended to overrule the authority that we cite, and not to have any bearing on the present point.

*Decree affirmed.*

Mr. Justice Pitney, with whom concurred Mr. Justice McKenna and Mr. Justice Van Devanter, dissenting.

Appellants, who were complainants below, filed their bill in the United States Circuit Court (afterwards District Court) in the month of February, 1911, to obtain an injunction against the prosecution of a conspiracy to restrain interstate trade and commerce in the products of complainants' woodworking mills and destroy their interstate business by means of a boycott. The federal jurisdiction was invoked both on the ground of diverse citizenship and on the ground that the action arose under the Sherman Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209. Upon the merits, the laws of the State of New York were relied upon, as well as the federal act. (General Business Law of N. Y., § 340; Penal Law of N. Y., § 580, subd. 6.)

It was found by the District Court (212 Fed. Rep. 259, 263, 266) that the defendants were engaged in a combination directly restraining competition between manufacturers and operating to restrain interstate commerce, in violation of both federal and state acts. The Circuit Court of Appeals assumed this to be so (214 Fed. Rep. 82), and there is no serious dispute about it here. The District Court dismissed the bill, upon the ground that injunctive relief under either statute could be had only at the instance of the United States, or the State of New York, as the case might be, and therefore complainants could not have relief in this suit; citing *National Fireproofing*

*Co.* v. *Mason Builders' Association*, 169 Fed. Rep. 259, 263. The Circuit Court of Appeals affirmed the decree upon the ground that defendants' acts were not malicious and not directed against the individual complainants personally, and hence relief by injunction could not be granted, irrespective of whether the particular combination in question was obnoxious either to the common law or to the statutes. This decision was rendered on April 7, 1914.

In this court, the prevailing opinion is that, although the facts show a violation of the Sherman Act, a private person cannot maintain a suit for an injunction under its fourth section. I dissent from the view that complainants cannot maintain a suit for an injunction, and I do so not because of any express provision in the act authorizing such a suit, but because, in the absence of some provision to the contrary, the right to relief by injunction, where irreparable injury is threatened through a violation of property rights and there is no adequate remedy at law, rests upon settled principles of equity that were recognized in the constitutional grant of jurisdiction to the courts of the United States. I think complainants were entitled to an injunction also upon grounds of state law; but will confine what I have to say to the federal question.

The proofs render it clear that defendants are engaged in a boycotting combination in restraint of interstate commerce prohibited by and actionable under the Sherman Law, on the authority of *Montague & Co.* v. *Lowry*, 193 U. S. 38, 44–48; *Loewe* v. *Lawlor*, 208 U. S. 274, 292, *et seq.; Eastern States Retail Lumber Dealers' Assn.* v. *United States*, 234 U. S. 600, 614; *Lawlor* v. *Loewe*, 235 U. S. 522, 534. The proof is clear also that the conspiracy is aimed at the property rights of complainants in particular; certainly that it is designed to injure directly and drive out of business a limited class of traders—the so-called "non-union" woodworking mills—to which complainants belong; that complainants are sustaining direct

,474 OCTOBER TERM, 1916.

Pitney, McKenna, and Van Devanter, JJ., dissenting. 244 U. S.

and serious injury through the closing of the channels of interstate trade to their products, an injury quite different from that suffered by the public in general; and that it is a continuing injury not adequately remediable by the ordinary action at law or the action for treble damages under the Sherman Act, and hence is an irreparable injury in the sight of equity. That there is no particular animosity towards complainants as individuals—assuming it to be true—is, in my view, a matter of no consequence. If evidence of malice be necessary (and I do not think it is), this is only in the sense that malice consists in the intentional doing of an unlawful act, to the direct damage of another, without just cause or excuse. *Brennan* v. *United Hatters*, 73 N. J. L. 729, 744.

Free access to the markets through unobstructed channels of commerce is the very breath of the life of such manufacturing establishments; and to say that complainants are not specially injured by the conduct of defendants seems to me to require that the eyes be closed to the evidence in the case and to the familiar facts of commerce. I do not understand either of the courts below to have held as matter of fact that complainants were not specially injured; but that the District Court (212 Fed. Rep. 267), while finding in fact that complainants were directly injured, reasoned (erroneously, as I think,) that it was not such special injury as was contemplated by certain New York decisions cited.

Section 1 of the Sherman Act declares that every combination or conspiracy in restraint of trade or commerce among the several States or with foreign nations is illegal, and imposes a punishment of fine or imprisonment upon the guilty parties. It clearly recognizes, what is well known, that injury to other traders and competitors is the primary effect of such a combination. A right of action for damages by a party specially aggrieved would have followed by implication (*Texas & Pacific Ry. Co.*

v. *Rigsby*, 241 U. S. 33, 39); and it was doubtless because treble damages were to be allowed that an express authorization of suit at law was included in the act. Section 7.

The fourth section provides: "The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations," etc. The act was designed to be highly remedial, so far as *preventing* restraints of trade and commerce is concerned, and the semi-colon in the sentence just quoted indicates, as I think, that the grant of jurisdiction was intended to be general, and that the following clause was intended to impose a special duty upon the district attorneys to resort to that jurisdiction whenever, in the discretion of the Attorney General, a public prosecution should seem to be called for.

Nor is the omission of an express declaration that persons threatened with special injury through violations of the act may have relief by injunction, of particular significance. Declarations of that character are rarely met with in the legislation of Congress.[1] The reason is not far to seek. By § 2 of Article III of the Constitution, the judicial power is made to extend to "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States," etc. This had the effect of adopting equitable remedies in all cases arising under the Consti-

---

[1] Section 16 of the so-called Clayton Act of October 15, 1914, c. 323, 38 Stat. 730, 737, contains such a provision; but this was inserted only because some of the federal courts had held—erroneously, as I think—that private parties could have no relief by injunction against threatened violations of the Sherman Act. These decisions will be discussed below.

476 OCTOBER TERM, 1916.

Pitney, McKenna, and Van Devanter, JJ., dissenting. 244 U. S.

tution and laws of the United States where such remedies are appropriate. The federal courts, in exercising their jurisdiction, are not limited to the remedies existing in the courts of the respective States, but are to grant relief in equity according to the principles and practice of the equity jurisdiction as established in England. *Robinson* v. *Campbell*, 3 Wheat. 212, 221, 223; *United States* v. *Howland*, 4 Wheat. 108, 115; *Irvine* v. *Marshall,* 20 How. 558, 565. In *United States* v. *Detroit Lumber Co.*, 200 U. S. 321, 339, the court, by Mr. Justice Brewer, declared: "It is a mistake to suppose that for the determination of equities and equitable rights we must look only to the statutes of Congress. The principles of equity exist independently of and anterior to all Congressional legislation, and the statutes are either annunciations of those principles or limitations upon their application in particular cases."

To speak accurately, it is not the statute that gives a right to relief in equity, but the fact that in the particular case the threatened effects of a continuing violation of the statute are such as only equitable process can prevent. The right to equitable relief does not depend upon the nature or source of the substantive right whose violation is threatened, but upon the consequences that will flow from its violation. As the court, by Mr. Justice Field, declared in *Holland* v. *Challen*, 110 U. S. 15, 25: "If the controversy be one in which a court of equity only can afford the relief prayed for, its jurisdiction is unaffected by the character of the questions involved."

To take a familiar example: The Constitution of the United States does not declare in terms that infringements of the rights thereby secured may be prevented by injunction. Ordinarily they may not be. It is only where a threatened infringement will produce injury and damage for which the law can afford no remedy—such, for instance, as irreparable and continuing damage, or a

multiplicity of suits—that resort may be had to equity; and when this does appear, the right to an injunction arises because that is the only appropriate relief. *Osborn* v. *United States Bank,* 9 Wheat. 738, 838–845; *Pennoyer* v. *McConnaughy,* 140 U. S. 1, 12, 18; *Fargo* v. *Hart,* 193 U. S. 490, 503.

So, tax laws rarely, if ever, contain express authorization of an injunction to restrain illegal taxes. And a suit in equity will not lie on the mere ground that a tax is illegal. But if, in addition, enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or if the property taxed is real estate and the tax throws a cloud upon the title, equity will interfere by injunction. *Dows* v. *City of Chicago,* 11 Wall. 108, 112; *Hannewinkle* v. *Georgetown,* 15 Wall. 547; *Union Pacific Ry. Co.* v. *Cheyenne,* 113 U. S. 516, 525; *Pacific Express Co.* v. *Seibert,* 142 U. S. 339, 348; *Ogden City* v. *Armstrong,* 168 U. S. 224, 237; *Ohio Tax Cases,* 232 U. S. 576, 587.

The fact that the threatened invasion of plaintiffs' rights will amount at the same time to an offense against the criminal laws is no bar to relief by injunction at the instance of a private party. *In re Debs,* 158 U. S. 564, 593.

I find nothing in the letter or policy of the Sherman Act to exclude the application of the ordinary principles of equity, recognized in the constitutional grant of jurisdiction. Applying them to the facts of the present case, appellants are entitled to an injunction to restrain the threatened, continuing, and irreparable injury and damage that otherwise will result from defendants' violation of the act.

The special duty imposed upon the Attorney General and the district attorneys is not inconsistent with this view. The field to be covered by such public prosecutions, and the objects sought thereby, are quite different from the scope and effect of an injunction granted to a private party threatened with special and irreparable injury to

478  OCTOBER TERM, 1916.

PITNEY, McKENNA, and VAN DEVANTER, JJ., dissenting.  244 U. S.

his property rights through a violation of the act. The proceeding by the district attorney is a kind of equitable *quo warranto*, calculated to bring the entire combination to an end, whether it be in the form of a corporation or otherwise. But there may be and are cases of direct and irreparable injury to private parties resulting from violations of the act, not capable of being redressed through actions at law under § 7; and justice to the parties aggrieved requires that the act be construed, if the language admits of such a construction (and I think it does), so as to allow an injunction to prevent irreparable injury to a private party, otherwise remediless, without going to the extent of dissolving the combination altogether, which in some cases might not be a matter of public interest or importance. Unless so construed, the act must operate in many instances to deprive parties of a right of injunction that they would have had without it. So far at least as boycotting combinations are concerned—and this case is of that character—the act creates no new offense and gives no new right of action. *Temperton* v. *Russell*, 1893, 1 Q. B. Div. 715; *Quinn* v. *Leathem*, 1901, A. C. 495; *Barr* v. *Essex Trades Council*, 53 N. J. Eq. 101, 112–121; *Jonas Glass Co.* v. *Glass Bottle Blowers' Assn.*, 77 N. J. Eq. 219, 225.

I find no controlling decision in this court. *Minnesota* v. *Northern Securities Co.*, 194 U. S. 48, 71, is not an authority against the right of complainants to an injunction to prevent special and irreparable damage to their property rights through a violation of the Sherman Act; the effect of that decision being merely to deny relief by injunction to individuals not directly and specially injured. There the State of Minnesota sued in one of its own courts under certain statutes of its own, as well as under the Sherman Act, and the case was removed to the United States Circuit Court as being one arising under the Constitution and laws of the United States. The purpose of

the suit was to annul an agreement and suppress a combination alleged to exist between the defendant railroad corporations; and the only threatened injury because of which an injunction was prayed was that the State, being the owner of large tracts of land whose value depended upon free and open competition over the lines of railway involved in the combination, and being the owner of certain public institutions whose supplies must of necessity be shipped over the same railways, it was alleged that the successful maintenance of these institutions as well as the performance by the State of its governmental functions depended largely upon the value of real and personal property situate within the State and the general prosperity and business success of its citizens, and that these in turn depended upon maintaining free and unrestricted competition between the railway lines involved. The court, by Mr. Justice Harlan, said (p. 70) that the threatened injury was at most only remote and indirect, and such as would come alike, although in different degrees, to every individual owner of property in a State by reason of the suppression of free competition between interstate carriers, and was "not such a direct, actual injury as that provided for in the seventh section of the statute"; and that upon the view contended for, "every individual owner of property in a State may, upon like general grounds, by an original suit, *irrespective of any direct or special injury to him* [italics mine], invoke the original jurisdiction of a Circuit Court of the United States, to restrain and prevent violations of the Anti-trust Act of Congress." It was said further (p. 71): "Taking all the sections of that act together, we think that its intention was to limit direct proceedings in equity to prevent and restrain *such violations* of the Anti-trust Act *as cause injury to the general public, or to all alike, merely from the suppression of competition* in trade and commerce among the several States and with foreign nations, *to those instituted*

*in the name of the United States.* . . . Possibly the
thought of Congress was that by such a limitation upon
suits in equity of a general nature to restrain violations of
the act, *irrespective of any direct injury sustained by par-
ticular persons or corporaĉions,* interstate and international
trade and commerce and those carrying on such trade and
commerce, as well as the general business of the country,
would not be needlessly disturbed by suits brought, on
all sides and in every direction, to accomplish improper
or speculative purposes." [Italics mine.]  The reasoning
manifestly proceeds upon the assumption that individuals
sustaining direct and irreparable injury through a con-
tinuing violation of the act would be entitled to an in-
junction.

*Wilder Mfg. Co.* v. *Corn Products Refining Co.,* 236
U. S. 165, 174, 175, is not in point.  There plaintiff in
error, which had purchased, received, and consumed goods
from defendant in error, defended a suit for the price
upon the ground that defendant in error was an illegal
combination in violation of the Sherman Act, and there-
fore could not sue to recover for goods sold with direct
reference to and in execution of agreements that had for
their object and effect the accomplishment of the illegal
purposes of the combination.  The court held that an
individual could not defend a suit brought against him
on his otherwise legal contract by asserting that the cor-
poration or combination suing had no legal existence be-
cause of its violations of the act, the statute having cast
upon the Attorney General of the United States the
responsibility of enforcing its provisions in that regard.

The question whether private parties threatened with
injury through violations of the Sherman Act might (prior
to the Clayton Act of October 15, 1914, c. 323, § 16, 38
Stat. 730, 737) have relief by injunction is one upon which
the lower federal courts are not in accord.  In the present
case, the District Court, in dismissing the bill upon the

ground that relief by injunction might be had only at the instance of the United States (212 Fed. Rep. 259, 266), merely cited and relied upon *National Fireproofing Co.* v. *Mason Builders' Association,* 169 Fed. Rep. 259, 263. That case was decided upon the authority of *Greer* v. *Stoller,* 77 Fed. Rep. 1, 3, and *Southern Indiana Exp. Co.* v. *United States Exp. Co.,* 88 Fed. Rep. 659, 663. Reference was made also to *Bement* v. *National Harrow Co.,* 186 U. S. 70, 87, 88, where the point was assumed *arguendo; Post* v. *Railroad,* 103 Tennessee, 184, 228, where it was ruled on the authority of 86 Fed. Rep. 407 and 88 Fed. Rep. 659, 663; and the following cases in the federal courts: *Blindell* v. *Hagan* (C. C.), 54 Fed. Rep. 40, 41; *Hagan* v. *Blindell* (C. C. A.), 56 Fed. Rep. 696; *Pidcock* v. *Harrington* (C. C.), 64 Fed. Rep. 821; *Gulf &c. R. Co.* v. *Miami Steamship Co.* (C. C. A.), 86 Fed. Rep. 407, 420; *Block* v. *Standard Distilling &c. Co.* (C. C.), 95 Fed. Rep. 978; and *Metcalf* v. *American School-Furniture Co.* (C. C.), 108 Fed. Rep. 909. An examination of these cases (including *Greer* v. *Stoller* and *Southern Indiana Exp. Co.* v. *United States Exp. Co., supra*) discloses that *Blindell* v. *Hagan,* 54 Fed. Rep. 40, 41, is the source from which all the others derive the only authority they have for the doctrine that under the Sherman Act the remedy by injunction was available to the Government only. But one or two of the cases contain any reasoning upon the question, and that is meager and unsatisfactory.

Moreover, so far as these cases have held that private parties could have no injunction for a violation of the Sherman Act (some of them have not so held), the real ground of decision in *Blindell* v. *Hagan* was misunderstood. In that case the jurisdiction of the federal court was invoked upon the ground of the alienage of complainants, defendants being citizens of the State of Louisiana, and also upon the ground that defendants were engaged in a combination in restraint of trade between New Orleans

and Liverpool, contrary to the prohibition of the Sherman
Act. The Circuit Court, in declining to allow an injunc-
tion under the act, said: "This act makes all combinations
in restraint of trade or commerce unlawful, and punishes
them by fine or imprisonment, and authorizes suits at law
for triple damages for its violation, but it gives no new
right to bring a suit in equity, and a careful study of the
act has brought me to the conclusion that suits in equity
or injunction suits by any other than the government of
the United States are not authorized by it." Evidently
this was intended to be confined to the question of an ex-
press authorization of an injunction for a mere violation
of the act, for the court proceeded to grant preventive
relief on the ground that there was jurisdiction because
of the citizenship of the parties, and that under the or-
dinary equity jurisdiction an injunction should issue be-
cause of the threatened irreparable injury and the in-
adequacy of pecuniary compensation, and in order to
prevent a multiplicity of suits. Upon appeal the decree
was affirmed, upon the grounds expressed by the court
below, 56 Fed. Rep. 696. Since there was no infringement
of complainants' rights except through a combination in
restraint of foreign trade, as to which manifestly the
Sherman Act furnished the exclusive rule of law, the effect
of the decision is to allow an injunction to one injured
through a violation of that act if he show in addition the
ordinary grounds for resorting to equity, such as the
probability of irreparable mischief, the inadequacy of a
pecuniary compensation, or the necessity of preventing a
multitude of suits.

So, in *Bigelow* v. *Calumet & Hecla Mining Co.* (C. C.),
155 Fed. Rep. 869, 876, the court, after reviewing the
previous decisions, declared (p. 877): "They do not com-
mend themselves to my judgment so far as they deny
the right of a private party, who has sustained special
injury by a violation of the Anti-trust Act, to relief by

injunction under the general equity jurisdiction of the court.   As already seen, the cases referred to do not generally announce such rule."

Aside from their rights under the Act of 1890, I think appellants are now entitled to an injunction under § 16 of the Clayton Act—the case clearly being within the terms of the section—notwithstanding the act took effect after the final decree in the District Court.   In an equity suit for injunction the reviewing court should decide the case according to the law as it exists at the time of its decision.   This is not giving a retrospective effect to the new statute, for the relief granted operates only *in futuro*.

The suggestion, in behalf of defendants, that § 6 of the Clayton Act [1] establishes a policy inconsistent with relief by injunction in such a case as the present, by making legitimate any acts or practices of labor organizations or their members that were unlawful before, is wholly inadmissible.   The section prohibits restraining members of such organizations from *"lawfully* carrying out the *legitimate* objects thereof."   What these are is indicated by the qualifying words: "instituted for the purposes of mutual help, and not having capital stock or conducted for profit."   But these are protected only when "lawfully carried out."   The section safeguards these organizations while pursuing their *legitimate* objects by *lawful* means, and prevents them from being considered, merely because organized, to be illegal combinations or conspiracies in restraint of trade.   The section, fairly construed, has

---

[1] "Sec. 6. That the labor of a human being is not a commodity or article of commerce.   Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

484 . OCTOBER TERM, 1916.

PITNEY, McKENNA, and VAN DEVANTER, JJ., dissenting. 244 U. S.

no other or further intent or meaning. A reference to the legislative history of the measure confirms this view. House Rep. No. 627, 63d Cong., 2d sess., pp. 2, 14–16; Senate Rep. No. 698, 63d Cong., 2d sess., pp. 1, 10, 46. Neither in the language of the section, nor in the committee reports, is there any indication of a purpose to render lawful or legitimate anything that before the act was unlawful, whether in the objects of such an organization or its members or in the measures adopted for accomplishing them.

It is altogether fallacious, I think, to say that what is being done by the present defendants is done only for the purpose of strengthening the union. Conceding this purpose to be lawful, it does not justify or excuse the resort to unlawful measures for its accomplishment. A member of a labor union may refuse to work with non-union men, but this does not entitle him to threaten manufacturers for whom he is not working, and with whom he has no concern, with loss of trade and a closing of the channels of interstate commerce against their products if they do not conduct their business in a manner satisfactory to him.

And the suggestion that, before the Clayton Act, unlawful practices of this kind were usually and notoriously resorted to by labor unions, and that for this reason Congress must have intended to describe them as "legitimate objects," and thus render lawful what before was unlawful, is a libel upon the labor organizations and a serious impeachment of Congress.

Nor can I find in § 20 of the Clayton Act anything interfering with the right of complainants to an injunction. It refers only to cases "between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment."

These words evidently relate to suits arising from strikes and similar controversies, and the committee reports upon the bill bear out this view of the scope of the section. But this is not such a suit.   There is no relation of employer and employee, either present or prospective, between the parties in this case.   Defendants who are employees are in one branch of industry in New York City; complainants are employers of labor in another branch of industry in distant States.   Nor is there any dispute between them concerning terms or conditions of employment.   Section 20 prohibits an injunction restraining any person "from ceasing to patronize or to employ any party to *such dispute,* or from recommending, advising, or persuading others by *peaceful and lawful* means so to do;   .   .   .   or from peaceably assembling *in a lawful manner, and for lawful purposes;* or from doing any act or thing *which might lawfully be done in the absence of such dispute* by any party thereto."

Clearly, this provision is limited to the participants in a dispute of the character just indicated.   And, quite as clearly, only "lawful" measures are sanctioned—that is, of course, measures that were lawful before the act. There is no grant, in terms or by necessary inference, of immunity in favor of a boycott of traders in interstate commerce, violative of the provisions of the Sherman Act, to which the Clayton Act is supplemental.

MR. JUSTICE McREYNOLDS also dissents.